Filed 1/27/21  P. v. Veliz CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B286376 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA434647) |
| v. | |
| LUIS VELIZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund W. Clarke, Judge.  Convictions affirmed; remanded with directions.

Susan Wolk, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

Luis Veliz appeals from a judgment after a jury convicted him of attempted willful, deliberate, and premeditated murder (Pen. Code,[1] §§ 664, 187), assault with a firearm (§ 245, subd. (a)(2)), and possession of a firearm by a felon (§ 29800, subd. (a)(1)), with true findings on gang enhancements (§ 186.22, subd. (b)(1)), firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subd. (d)), and a great bodily injury enhancement (§ 12022.7, subd. (a)).  Veliz argues on appeal:  (1) he received ineffective assistance of counsel at trial and in his motion for new trial; (2) the trial court erred in admitting hearsay evidence concerning the alleged motive for the crimes; (3) the prosecutor committed prejudicial misconduct in closing argument; (4) the evidence was insufficient to support the convictions; (5) the evidence was insufficient to support the gang enhancements; (6) the trial court erred in failing to instruct the jury on the organizational nexus requirement of the gang enhancements; and (7) the matter must be remanded for resentencing to permit the trial court to exercise its discretion under section 12022.53, subdivision (h).  We affirm the convictions and remand the matter for resentencing.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *The Charges*

In an amended information, the Los Angeles County District Attorney charged Veliz with two counts of attempted

---

[1]     Undesignated statutory references are to the Penal Code.

willful, deliberate, and premeditated murder (§§ 664, 187),**2** one count of assault with a firearm (§ 245, subd. (a)(2)), and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)).  The amended information also alleged gang enhancements (§ 186.22, subd. (b)(1)); firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d)); and a great bodily injury enhancement (§ 12022.7, subd. (a)).  In addition, the People alleged Veliz had one prior serious felony conviction within the meaning of section 667, subdivision (a)(1), and two or more serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(j), 1170.12), and had served one prison term within the meaning of section 667.5, subdivision (b).

B. *Evidence At Trial*

1. *Veliz's Prior Contacts with Various Witnesses*

On November 26, 2014, a shooting occurred at a residence on New England Street in Los Angeles.  The residence where the shooting took place consisted of a front house and a back house with a patio area in between them.  Cecilia Martinez, the owner of the residence, lived in the back house with her boyfriend, William Irdata.  Daniel Monge and his friend Christopher Luna each rented a room in the front house.  Christian Lopez and his brother, Walter Lopez,[3] lived across the street and were friends with Martinez and Monge.  Martinez often held barbeques at the residence for people in the neighborhood.

---

**2**      On the People's motion, the trial court later dismissed one of the attempted murder counts pursuant to section 1385.

**3**      We refer to the Lopez family members by their first names.

Monge was a member of a local gang known as the Drifters. His gang moniker was "Jester." Monge joined the Drifters when he was 14 years old and belonged to the Bagos clique of the gang. He previously had been the victim of a drive-by shooting by a rival gang. Monge was aware that gang members who broke a rule of their gang might be disciplined by getting "beat down" and "their ass whooped." Monge testified, however, that he "never really followed" the leaders of his own gang, asserting "who gave them the authority over me."

Monge was familiar with Veliz, whom he knew as "Dillinger." Veliz was a fellow member of the Drifters and belonged to the Pico Locos clique of the gang. While Monge "never really associated with [Veliz]," he had known Veliz's girlfriend, Roxanne Rojas, for a number of years because they resided in the same neighborhood. Rojas also was part of the Drifters gang. Monge did not get along with Rojas because he thought she had a "loud mouth" around other gangsters. Neither Luna nor the Lopez brothers were Drifters gang members.

Martinez was friendly with Veliz and Rojas. Prior to the shooting, Veliz and Rojas had visited the New England Street residence four or five times, and Martinez had cooked food for them. Each time, they stayed for about 30 minutes. Luna was also familiar with Veliz and Rojas, and had observed them at the residence on four prior occasions. They had mingled with other people, and did not appear to have conflicts with anyone. The Lopez brothers had not met Veliz or Rojas. However, Christian had seen Rojas around the neighborhood a couple of times. Approximately three months before the shooting, Walter saw Veliz for a few minutes when Veliz arrived in a car with Rojas. Veliz had long hair that he often wore in a ponytail.

4

## 2. *The Shooting of Monge and Christian*

On the morning of November 26, 2014, Martinez held a barbeque in the patio area of the residence.  The guests included Christian, Walter, Irdata, and a man named Cesar Soto.  Walter brought a 24-case of beer to the gathering.  As Martinez prepared the food, the men drank beer and socialized.  Walter had about five beers, and Christian had three or four beers.

At some point, Veliz, Rojas, and an older man with gray hair and black clothing arrived at the residence.  Veliz was wearing a white t-shirt and a sweater, and wore his hair in a ponytail.  Monge and Luna were inside the front house when the group arrived.  Monge was with his girlfriend and young child.  Luna was in his room getting ready to join the gathering outside.  From his bedroom window facing the driveway, Luna observed Rojas, Veliz, and the older man walking up the driveway toward the patio.

Once in the patio, Rojas introduced Martinez to the older man as her friend.  While the older man sat down on a couch in the patio, Veliz remained standing.  Christian felt Veliz and his companions were acting in an aggressive manner as soon as they arrived.  Veliz did not introduce himself to the group.  Instead, he grabbed a beer for himself and his male friend without asking permission.  Shortly after arriving, Rojas asked for Monge.  In response, Martinez went to the front house and told Monge that Rojas was there and wanted to talk to him.  When Monge did not immediately come out to the patio, Rojas asked for him again.  Martinez assured Rojas that Monge would be there soon.  With a worried look on her face, Rojas asked for Monge a third time, stating:  "Where the fuck is Daniel?"  While waiting for Monge, Rojas also asked Martinez for pain pills for Veliz.  As Martinez

went to the back house to retrieve the pills, Monge entered the patio. Martinez saw Monge casually walk up to Rojas and ask her, "What's up?"

A short time later, Veliz left the gathering for a few minutes. When Veliz returned, Martinez was in the back house looking for the pain pills that Rojas had requested. Christian was seated on the couch next to the older unidentified man. Monge and Walter were standing near one another and facing Christian. Veliz quickly approached Monge from behind, pointed a gun directly to the back of his head, and fired at least two shots. One shot hit Monge in the back of his head, causing him to fall to the ground. The second shot hit Christian in his left leg. After firing the shots, Veliz ran from the patio down the driveway toward the street. He then continued running down the street toward a nearby school.

Luna was in his bedroom in the front house when he heard the gunshots. He immediately dropped to the floor. Monge's girlfriend ran into the room. She told Luna she thought "they came to hurt" Monge and asked him what she should do. Luna instructed her not to do anything at that time because it was not safe. After about five seconds, Luna stood up and looked out his bedroom window. He saw Veliz walking down the driveway toward the street. Rojas and the older man followed about 30 seconds later. Luna tried to calm down Monge's girlfriend and daughter, both of whom were scared. Luna then walked toward the front of the house and looked out the window facing the street. He saw Veliz, Rojas, and the older man get into a green vehicle and drive away.

Victor Begazo, an employee of the Los Angeles Unified School District, was working in front of Magnolia Elementary

School when he heard gunshots. A short time later, Begazo saw a White or Hispanic man running nearby. The man stopped near Begazo, pulled a gun from his waistband, and hid the gun under a wooden fence. He then continued running. Begazo noticed the man had a ponytail, but never saw his face.

The day after the shooting, Martinez searched Rojas's Facebook page and found a photo of Veliz. In the photo, Veliz had a ponytail and was shirtless with tattoos on his upper chest. Martinez showed the photo to Christian, Walter, and Luna. The three men agreed that the person in the photo was the one who had committed the shooting. Each of the men identified Veliz as the shooter at trial.

### 3. *The Police Investigation*

Detective Maggie Sherman of the Los Angeles Police Department (LAPD) was the lead investigating officer assigned to the case. On December 9, 2014, she interviewed Monge at the hospital. Detective Sherman had been unable to interview Monge before that date because he was unconscious due to his injury. Monge had no recollection of any events that occurred on the day of the shooting. When asked about Veliz, Monge responded that Veliz was a friendly guy and that there were no problems between them. Monge also stated he did not think he had been targeted by his own gang in the shooting. Monge told Detective Sherman, however, that he previously received a call from someone in prison who asked him to sell narcotics for the gang. Monge said no to the request. While at the hospital, Detective Sherman also spoke with Monge's mother, who showed the detective Facebook photos of Veliz and Rojas on her cell phone.

7

On January 13, 2015, Detective Sherman interviewed Christian at the police station. Christian stated the shooter was wearing both a shirt and sweater and had no visible tattoos. During the interview, Detective Sherman showed Christian a six-pack photographic lineup that included Rojas. Christian made a positive identification of Rojas. Christian also showed Detective Sherman the Facebook photo of Veliz that Martinez had found, and indicated that the person in the photo was the shooter.[4]

Detective Sherman later prepared a six-pack photographic lineup that included Veliz. In March 2015, Detective Sherman showed the photographic lineup to Martinez, Luna, and Walter during separate interviews. Upon viewing the lineup, Martinez and Luna quickly identified Veliz as the man from the barbeque. Walter was unable to identify Veliz at that time, but he showed Detective Sherman the same Facebook photo of Veliz that had been shared by other witnesses. Walter also told the detective the shooter wore a white t-shirt and had tattoos on his face (which Veliz did not have). At the preliminary hearing held in February 2016, Walter and Christian identified Veliz as the shooter. The police did not locate Rojas.

On the day of the shooting, the police recovered 24 bottles of beer from the patio of the residence. A forensic print specialist with the LAPD obtained 15 latent prints from 11 of the bottles. Seven of the latent prints matched those belonging to Walter,

---

[4]     At the time of Christian's interview, Detective Sherman had not yet created a photographic lineup for Veliz. Following the interview, Detective Sherman arrested Christian for an unrelated attempted murder charge. Christian was later convicted of attempted murder.

Christian, and Cesar Soto. None of the prints matched those belonging to Veliz. A criminalist in the LAPD's serology DNA unit tested the beer bottles for DNA evidence and obtained six different male DNA samples. None of the samples matched Veliz's DNA. Eight of the bottles contained insufficient DNA to identify or exclude Veliz as a contributor.

The police also recovered a .22-caliber revolver with two spent cartridges from under a wooden fence, 200 to 300 feet from the New England Street residence. The forensic print specialist obtained one latent print from the frame of the revolver right above the trigger. The print "was not of sufficient quality to run through" the LAPD fingerprint identification databases. Based on a manual comparison, however, the print did not belong to Veliz. The LAPD tested the revolver for DNA, but recovered no usable DNA.

At trial, the parties stipulated that, prior to the shooting, Veliz had been convicted of a felony offense.

### 4. *The Gang Expert Testimony*

Officer Paolo Molina testified as a gang expert for the People. He was a gang officer in the LAPD's Olympic Division, and investigated crimes committed by gangs in the area, including the Drifters. According to Officer Molina, the Drifters was a single gang with approximately 100 documented members. The gang was comprised of several cliques, including the 12th Street Bagos and the Picos Locos. All of the cliques got along with one another and were enemies of the rival gangs that bordered their territory. At the time of the shooting, the Drifters' territory included the neighborhood where the shooting occurred. The Drifters used the acronyms "DFS" and "X3" as common signs or symbols in their graffiti and gang tattoos. The primary

activities of the Drifters gang were robbery, grand theft auto, murder, and attempted murder. Monge was a member of the Drifters and was convicted of taking a vehicle without the owner's consent (Veh. Code, § 10851) on May 5, 2013. Walter Pereira also was a Drifters gang member and was convicted of robbery (§ 211) on May 15, 2013.

Although Officer Molina had never met Veliz, based on his review of photographs depicting Veliz's various tattoos, he opined Veliz was a Drifters gang member. Veliz's tattoos included the word "Drifters" on his stomach, the word "West" on his chest, and the letters "DFS" on the back of his head. Officer Molina testified he had never seen anyone with similar tattoos who was not a Drifters gang member.

When presented with a hypothetical question based on the facts of this case, Officer Molina opined the shooting would have been committed for the benefit of a gang. Officer Molina testified: "When you break a rule, that gang member is going to be expected to be punished in a certain way, and it's usually [through] the use of violence, depending on . . . how serious the allegation was that he made. In this instance he wasn't following the rules and he was disrespecting someone that's higher up, which is a pretty big allegation. So in order to keep the gang member in check, . . . the gang has to resort to do something about that. . . . He could get beat up by a group of other gang members, or he could end up getting stabbed. He could end up getting shot, or even possibly killed because he broke the rules. This benefits the gang because it also puts the other members of that gang in . . . check[.] It shows them that, hey, if you don't listen to what we're telling you, then this is what's going to happen to you. So that way that gang [member] is going to be

more willing to partake in any other type of crimes that anybody in the gang is telling him to be part of."

At the close of the People's case-in-chief, the defense rested without presenting any evidence.

## C. *Jury Verdict and Sentencing*

The jury found Veliz guilty of the attempted willful, deliberate, and premeditated murder of Monge, assault with a firearm on Christian, and possession of a firearm by a felon. The jury also found true all enhancement allegations. The trial court sentenced Veliz to life in state prison with a minimum parole eligibility of 30 years, plus 25 years to life. Veliz timely appealed.

## DISCUSSION

### A. *Veliz Has Not Met His Burden To Demonstrate Ineffective Assistance of Counsel*

Following the jury's verdict, Veliz retained new private counsel and filed a motion for new trial. In his motion, Veliz argued his trial counsel provided ineffective assistance by failing to call an eyewitness identification expert, a fingerprint or DNA expert, and a gang expert to testify. He raises those same ineffective assistance claims on appeal, and argues the trial court erred in denying his new trial motion. Veliz also raises a number of other ineffective assistance claims for the first time, and asserts those claims further establish that his counsel was constitutionally deficient. We conclude Veliz's ineffective assistance claims lack merit.

#### 1. *Relevant Background*

##### a. *The defense rests without calling any experts*

Private counsel, Michael Becker, represented Veliz at trial. Following several continuances, trial commenced on February 6,

11

2017. At the end of the day on Friday, February 10, the prosecutor advised the trial court that the People likely would rest the following Tuesday, February 14.[5] When trial resumed on February 14, Becker informed the trial court that he had spoken with his eyewitness identification expert, Dr. Mitchell Eisen, on Friday evening, and had learned Dr. Eisen would not be available to testify until Tuesday, February 21. Becker explained that, rather than request a week-long adjournment to allow for Dr. Eisen's testimony, the defense had decided not to call Dr. Eisen as a witness "for a number of reasons." Becker added that he had prepared a "two-page" memorandum "detailing [the] tactical reasons why [he] should or should not call Dr. Eisen," and reviewed the memorandum with Veliz over the past weekend. Becker and Veliz also had discussed "at length" whether to call their gang expert, Martin Flores, as a witness. Becker stated that, at the conclusion of their meeting, Veliz had "agreed with [him] and understood and supported the decision not to call Dr. Eisen," and that the "same was true" as to the decision not to call gang expert Flores.

In response to the trial court's question whether he had listened to his counsel's explanation as to the eyewitness identification and gang expert witnesses, Veliz responded "Yes, your honor." The court then asked whether Veliz "understood" and "agreed" with his counsel's explanation. Veliz again answered, "Yes, your honor."

b. *Veliz files a motion for new trial*

Following the jury's verdict, Veliz retained new private counsel, Lonnie McDowell, to represent him in the post-trial

---

[5]     Monday, February 13, 2017 was a court holiday.

proceedings. Veliz thereafter filed a motion for new trial in which he argued that Becker had provided ineffective assistance of counsel at trial by failing to call necessary expert witnesses, including an eyewitness identification expert, a DNA expert, a fingerprint expert, and a gang expert. Veliz also argued that the gang enhancement true findings should be reversed because they were partially based on inadmissible hearsay evidence provided by the prosecution's gang expert.

In support of his motion, Veliz attached Becker's two-page memorandum regarding the decision not to call Dr. Eisen. In the memorandum, Becker detailed the conversation he had with Dr. Eisen about their respective views of the case and the reasons why Becker believed Dr. Eisen's testimony was not necessary. In the memorandum, Becker quoted Dr. Eisen's, remark that "ours 'is a messy case on many levels.'" As set forth in the memorandum, Dr. Eisen viewed the case "as having issues involving 'social media' and 'contamination of witnesses.'" He wanted to focus his attention on the reasons Martinez "pulled the picture of [Veliz] off Facebook." Both Becker and Dr. Eisen agreed that Martinez "showing everyone the picture of [Veliz] was the fait accompli." Unlike Becker, however, Dr. Eisen did not think the discrepancies in the witnesses' testimony about the shooter's clothing, tattoos, and method of fleeing would be persuasive to the jury. Instead, Dr. Eisen thought "the jurors will feel that if they (the witnesses) all think it's [Veliz], it must be him." Dr. Eisen also thought the testimony about the man who discarded the gun having a ponytail was "'probably true'" because "'everything seems to fit.'" In response to Becker's assessment that Dr. Eisen was "not feeling what we're trying to sell," Dr. Eisen stated: "'[I]t doesn't matter if I'm not feeling it,

13

I'd offer the best explanation to achieve due process.'" In response to Becker's statement that he could "effectively explain the contamination issue during closing arguments," Becker quoted Dr. Eisen's statement, "You should go with your feeling.'"

Veliz also supported his motion with a three-page handwritten statement that he had prepared regarding his conversation with Becker about expert witnesses. According to Veliz, Becker visited him on February 11 to discuss trial strategy. Becker explained the eyewitness identification expert was not available to testify "due to a family accident," and the replacement that Becker had chosen "thought there was more than enough proof to convict." Becker advised Veliz that they did not need any experts because the trial was "going so well." Becker also referred to the trial as a "night in the club" and the jury as a "girl we wanted to have a one night stand with." Becker did not want to bring in an expert who was "not cooperating" and was "already declaring [Veliz] guilty." Becker also expressed concern they would be "penalized" by the judge or the jury if they were not ready to present any witnesses due to the People resting earlier than Becker had anticipated. As a result, the defense rested without presenting any evidence. According to Veliz, Becker's lack of preparation left "us with nothing to present to the jury."

c. *The trial court hears evidence on the motion*

The trial court held an evidentiary hearing on the motion for new trial. The following witnesses testified at the hearing: (i) Becker,[6] (ii) Dr. Iris Blandon-Gitlin, the defense's original

---

[6]     Prior to Becker's testimony, the trial court confirmed that Veliz had agreed to waive the attorney-client privilege regarding

14

eyewitness identification expert, (iii) Flores, the defense's gang expert, and (iv) Veliz.

### (i) Becker

Becker had placed his co-counsel, Celia Cho, in charge of seeking the appointment of an eyewitness identification expert. Cho selected Dr. Blandon-Gitlin as the defense expert, and provided her with case materials. Becker did not speak with Dr. Blandon-Gitlin or receive a report of her anticipated testimony. In late January 2017, Cho advised Becker that Dr. Blandon-Gitlin would not be available to testify at a trial starting on February 6. Becker did not know the reasons for Dr. Blandon-Gitlin's unavailability, and did not seek a continuance of the trial based on her unavailability. Instead, Becker "scrambl[ed] . . . to see if [he] could find another expert that would be available." Dr. Blandon-Gitlin suggested Dr. Eisen.

On February 3, 2017, Becker contacted Dr. Eisen about his availability for trial. Becker explained the trial was estimated to last two weeks, and gave Dr. Eisen a date range for when he might be expected to testify. Dr. Eisen indicated he would be available. After providing Dr. Eisen with the case file, Becker spoke with him about his anticipated testimony. They discussed how the witnesses had shared Veliz's Facebook photo "framed in what looked like a wanted poster." Dr. Eisen shared Becker's concern about "suggestiveness and contamination in the identification process." Prior to the start of trial, Becker had not decided whether he was going to call Dr. Eisen as a witness. However, "Becker wanted to have the option" of calling Dr. Eisen

his communications with Becker for purposes of the new trial motion.

15

"based on how the testimony comes out at trial."

After the People indicated their intent to rest "way ahead of schedule," Becker immediately contacted Dr. Eisen to inform him that he might need to testify the following week. At that time, Dr. Eisen stated for the first time he would not be available. In the same conversation, Becker discussed with Dr. Eisen the state of the case and Dr. Eisen's anticipated testimony. Dr. Eisen explained the "truth of the narrative" was that the eyewitnesses saw a man with a ponytail pull the trigger, and the details of what that man wore and whether he had facial tattoos were "noise." Dr. Eisen "felt the jury would be able to see the truth of the narrative." When Becker commented that Dr. Eisen was "not feeling [his] mojo," Dr. Eisen stated he would "still testify in a manner to assure [Veliz's] due process rights are protected."

Becker felt Dr. Eisen did not agree with how he intended to argue the case. Instead, Dr. Eisen considered Becker's arguments about certain discrepancies in the witnesses' testimony to be "noise" that the jury would not believe. After weighing the potential negative impact of Dr. Eisen's "noise" statements, which the prosecutor could have brought out on cross-examination, against Dr. Eisen's "helpful" anticipated testimony regarding suggestibility and contamination issues, Becker decided not to call Dr. Eisen as a witness. Becker explained: "So I felt, ultimately, that we were not on the same wavelength, and I trusted my instinct at that point and decided . . . that I didn't think we should call him, and I tried to convey to Mr. Veliz my reasoning." Becker also realized that "this was not a traditional identification case" because "some of the witnesses in the case had had previous . . . multiple encounters, with Mr. Veliz."

16

Because Becker believed his decision "might be considered an "unorthodox decision," he prepared the memorandum explaining his reasoning. On February 11, 2017, Becker met with Veliz to discuss his "thought process" and allow Veliz "to weigh in" on the decision. Becker read the memorandum to Veliz and shared Dr. Eisen's anticipated testimony. Becker also expressed his view that discrepancies in the witnesses' testimony about the shooter's dress and appearance were "very helpful" to the defense and that they were "in a good position at that point to bring the case to the jury." Becker did not recall discussing the reasons for Dr. Blandon-Gitlin's unavailability with Veliz, and he was not aware of those reasons until he reviewed the new trial motion. At the end of the meeting, Veliz agreed with the decision not to call Dr. Eisen and did not express any concerns. Becker also separately met with Veliz' family, and they agreed with the decision.

Prior to trial, Becker also consulted with a fingerprint expert. The expert explained that fingerprints might not be found on a cold beer bottle because the "condensation would impede contact with the glass." The expert also explained to Becker that certain parts of a gun were not conducive to retaining prints. Because Becker knew that information was not helpful to the defense and that he could cross-examine the People's fingerprint expert "to flush out many of the favorable angles of testimony," Becker did not seek the appointment of a fingerprint expert. Becker also felt he could effectively argue to the jury that the single print recovered from the gun, which was not Veliz's print, must have belonged to the shooter.

Becker did not consult with a DNA expert because he did not feel it was necessary. Becker knew that the People's expert

17

would explain why Veliz's DNA might not be found at the scene of the shooting even if he was present.  Becker felt he could effectively cross-examine the People's expert and draw out favorable points for the defense.  Becker also felt testimony from a defense expert about the reasons why a person's DNA might not be found on a bottle or a gun would not be helpful because it would offer the jury a "benign explanation" for why Veliz's DNA was not recovered from these items.

After discussing the case with Becker, gang expert Flores attended the trial when the People's gang expert testified.  Becker conferred with Flores before he cross-examined the People's expert.  Becker also met with Flores after the cross-examination.  Becker decided not to call Flores as a witness because Flores believed that the motive for the shooting was "personal" rather than gang related.  Becker was concerned expert testimony about a personal motivation "might give the jury an alternative mechanism to convict [Veliz] if they rejected the gang motivation."  Becker also was aware that, based on the sentence Veliz would receive if convicted of attempted murder, "this was a life case no matter how you sliced it."  Because "[w]inning the [gang] allegation was not going to save the day," Becker did not want to risk conceding Veliz might be guilty of the underlying offense.  Becker did not believe that "just trying to save [Veliz] from the gang allegation . . . was a good strategy."

(ii) *Dr. Blandon-Gitlin*

On June 28, 2016, the trial court appointed Dr. Blandon-Gitlin as an eyewitness identification expert for the defense.  In a "huge" percentage of the cases in which she was appointed as an expert, she was not called to testify.  In the summer of 2016, Cho sent Dr. Blandon-Gitlin materials related to the case.  After they

18

had a telephone conversation in September 2016 during which Dr. Blandon-Gitlin provided Cho with her preliminary opinion, they did not have any further communication until late January 2017.  At that time, Cho contacted Dr. Blandon-Gitlin to inform her the trial would be starting in a week and a half and learn Dr. Blandon-Gitlin's availability for trial.  However, Dr. Blandon-Gitlin was not available because she had family issues and other work commitments.  McDowell did not ask Dr. Blandon-Gitlin to state her opinions at the new trial hearing because the "sole purpose for [McDowell] calling her [was] her dealing with Mr. Becker on scheduling, getting her here, that [Becker] called her to testify, and then all of a sudden that fell apart."

(iii) *Martin Flores*

On February 8, 2017, the trial court appointed Flores as a gang expert for the defense.  Flores first spoke with Becker about the case in "mid" to "end of" January 2017.  At that time, Becker informed Flores the trial would be starting within a month and sent Flores case materials.  In February 2017, Flores provided Becker with his opinion of the case.  Flores's opinion was that, if Veliz was the shooter, his motive for the crime was "a personal response" because the Monge had a "prior conflict" with Veliz's girlfriend.

On February 13, 2017, Becker sent Flores an email confirming he was not going to call Flores as a witness.  In the email, Becker conveyed that he felt the case "was more of an I.D. issue" case, and bringing in a defense gang expert might "impact the case in a negative way by making it more of a gang case."

19

(iv) *Veliz*

Veliz's family retained Becker to represent him in October 2015.  Early on in his representation, Becker told Veliz that he wanted to retain an eyewitness identification expert, a DNA expert, and a fingerprint expert.  Shortly before trial began, Becker informed Veliz that an eyewitness identification expert had been appointed and that "everything [was] lined up ready for trial."

Becker visited Veliz over the weekend of February 10, 2017.  He explained Dr. Blandon-Gitlin was no longer available to testify because she had a family emergency.  Becker also stated that he had a second expert, Dr. Eisen, but "he was not favorable to our case," and Becker "wasn't feeling what Dr. Eisen was trying to say."  Becker told Veliz there was no time to look for another expert, and he was going to proceed without one because "the case . . . had been going good."  Becker indicated he did not want to request a continuance because the trial judge had a vacation scheduled for later that month, and the jury might feel they were prolonging the trial.  Although he "really trusted" Becker, Veliz conveyed to Becker that he was not happy with the decision because "there's only one side and we're just hearing what the D.A. has to say.  We don't have no say-so."

During the meeting, Becker and Veliz also discussed other experts.  Becker told Veliz he was not going to call a DNA or fingerprint expert because he felt he could present that evidence himself.  Becker said he had decided not to call a gang expert because "the case had been going so good, he felt like [they] were in a good position."  Becker did not discuss with Veliz the "pros and cons" of calling the fingerprint, DNA, or gang expert witnesses.  Instead, Becker made the one-night stand comment

20

about the jury. Veliz understood the comment to mean that they were "going to win" and "didn't need . . . experts."

### d. *The trial court denies the motion*

The trial court denied the motion for new trial. The trial court ruled: "I don't see that Mr. Becker's representation was inadequate. I believe there was an appropriate strategic reason for every decision made. I don't find that there's any adverse impact to the defendant from the failure to call any one of these expert[ ] witnesses. And that while Mr. McDowell, with the benefit of experience and hindsight, does his job in pointing out things he might have done differently, or others might have done differently, that's not the standard. So the motion for new trial is denied."

### 2. *Governing Law*

"'A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.'" (*People v. Rices* (2017) 4 Cal.5th 49, 65.) "In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance. [Citation.] To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance """fell below an objective standard of reasonableness . . . under prevailing professional norms.""" [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mickel* (2016) 2 Cal.5th 181, 198; see

*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *People v. Bell* (2019) 7 Cal.5th 70, 125 ["'[u]nless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy"'"].) "'"[I]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal."'" (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) "Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

"Usually, ineffective assistance of counsel claims are properly decided in a habeas corpus proceeding rather than on appeal." (*People v. Carrasco* (2014) 59 Cal.4th 924, 980-981; accord, *People v. Hoyt* (2020) 8 Cal.5th 892, 958.) A defendant may, however, raise the issue of counsel's effectiveness in a motion for new trial. (*People v. Hoyt,* at p. 958; *People v. Carrasco*, at p. 981.) "'[T]he trial court should consider a claim of ineffective assistance of counsel in a motion for new trial' when the "'issue of counsel's effectiveness can be resolved promptly at the trial level'" and justice will be thereby be expedited." (*People*

*v. Carrasco*, at p. 981.) "'""'"We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] "'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.'"'""'" (*People v. Hoyt*, at p. 957.)

### 3. *Veliz Has Not Met His Burden To Show Ineffective Assistance of Counsel*

Veliz contends Becker provided ineffective assistance by failing to call expert witnesses to testify at trial. Based on these same grounds, Veliz further contends the trial court abused its discretion in denying his motion for new trial. Veliz specifically asserts Becker lacked any rational tactical basis for his decision not to call to testify an eyewitness identification expert, a gang expert, and a DNA or fingerprint expert. Veliz further argues the lack of experts was prejudicial because it had the effect of withdrawing a defense to the charged crimes and enhancement allegations. In addition, Veliz claims his consent to proceed without experts was not knowing and voluntary because it was based on Becker's misrepresentations.

"The decision whether to call certain witnesses is a 'matter[] of trial tactics and strategy which a reviewing court generally may not second-guess.'" (*People v. Carrasco*, *supra*, 59 Cal.4th at p. 989; see also *People v. Bolin* (1998) 18 Cal.4th 297, 334] ["[w]hether to call certain witnesses is . . . a matter of trial tactics, unless the decision results from unreasonable failure to investigate"].) Accordingly, a contention that defense counsel was ineffective for failing to call an expert "'must be supported by declarations or other proffered testimony establishing both

23

the substance of the omitted evidence and its likelihood for exonerating the accused.  [Citations.]  We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.'"  (*People v. Bolin*, at p. 334; see *People v. Cunningham* (2001) 25 Cal.4th 926, 1033 [where "record does not reflect what evidence might have been presented" in the testimony of experts, reviewing court is "unable to infer anything about its existence, probative force, or the probable consequences at trial, had such evidence been presented"].)

### a.  *Failure to call an eyewitness identification expert*

Veliz asserts Becker was ineffective because he failed to take reasonable steps to ensure that an eyewitness identification expert was available to testify at trial in support of Veliz's "sole defense."  With respect to Dr. Blandon-Gitlin, Veliz claims Becker "admitted he failed to adequately communicate with Dr. Blandon-Gitlin" to determine her availability, and failed to seek a short continuance when he learned prior to trial that she would not be available.  With respect to Dr. Eisen, Veliz argues Becker also failed to adequately communicate with Dr. Eisen to assure he would be ready to testify in the event the People rested their case earlier than anticipated.  Veliz further contends Becker's "representation was deficient because he failed to call any eyewitness expert to refute the reliability of [Veliz's] identification as the shooter."  Without an expert, Becker "was relegated to arguing his personal opinion instead of evidence."

Becker could have acted with greater diligence to determine whether Dr. Blandon-Gitlin and Dr. Eisen would be available for trial, and whether each expert's proffered opinions would be favorable to the defense.  The record reflects that Becker's co-counsel did not contact Dr. Blandon-Gitlin about her

24

availability until a week and a half before trial was set to begin. Although Becker was the lead trial counsel, he never spoke with Dr. Blandon-Gitlin about her opinion of the case or how she intended to testify if called as a defense witness. Further, even though Becker learned of Dr. Blandon-Gitlin's unavailability in late January 2017, he did not secure another eyewitness identification expert until after he announced his readiness for trial on February 2. The record further reflects that Becker did not have a thorough discussion with Dr. Eisen about his opinion of the case until February 10, after the People announced their intention to rest on the next court date. During that discussion, Becker learned for the first time that Dr. Eisen would not be available to testify the following week when the defense had to present its case. Becker also learned that Dr. Eisen disagreed with Becker's assessment of the importance of the discrepancies in the witnesses' testimony about the shooter's clothing, tattoos, and method of fleeing. According to Becker, Dr. Eisen regarded those arguments as "noise" that the jury likely would reject. At that late stage in the trial, Becker made a tactical decision not to call Dr. Eisen as a witness.

Although Becker could have done more to timely ascertain the availability of Dr. Blandon-Gitlin and Dr. Eisen for trial as well as the substance of their anticipated testimony, we need not decide whether Becker's actions and omissions with respect to these experts fell below an objective standard of reasonableness. As the California Supreme Court has held, a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed." (*People v. Carrasco, supra*, 59 Cal.4th at p. 982; accord, *Strickland v. Washington, supra*, 466 U.S. at p. 697.) Veliz has failed to demonstrate prejudice.

Testimony of an eyewitness identification expert may be helpful to a jury's understanding of the case "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability," and there are "specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury." (*People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) Factors bearing on the reliability of an eyewitness identification that may be beyond the jury's common experience include "the effects on perception of an eyewitness' personal or cultural expectations or beliefs [citation], the effects on memory of the witness' exposure to subsequent information or suggestions [citation], and the effects on recall of bias or cues in identification procedures or methods of questioning." (*People v. McDonald,* at p. 368.) This does not mean, however, that defense counsel must call an expert in every case where an eyewitness identification is uncorroborated. (*People v. Datt* (2010) 185 Cal.App.4th 942, 952.) To the contrary, the Supreme Court has recognized that "[e]xpert testimony on the psychological factors affecting eyewitness identification is often unnecessary." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995; see *People v. McDonald*, at p. 377 ["[w]e expect that such evidence will not often be needed"].)

As the trial court explained in denying the motion for new trial, this was not a typical eyewitness identification case. The trial court found: "There were people saying he was there. And from what I can tell, no expert could have undermined at least part of that testimony, since Mr. Veliz was not a stranger to the people that were there. So are they lying that he was there? Possibly, if they had a motive. But that is not an I.D. issue, that's a bias issue or a motive to cause him harm. That is different. But the woman who did the cooking, Cecilia Martinez, she knew him. He was a guest at her house frequently. The others−I believe the two brothers had seen him in the neighborhood before. So I don't see what an eyewitness expert's going to say about that. You can certainly say someone who didn't know him would be contaminated by looking at his picture, especially if they heard a story saying he's the guy, yes. But that's if they didn't know him . . . Mr. Becker raised these things in his argument. You can argue about whether he leaned hard enough on the right ones, made the most efficient argument he could, but assuming he got his first eyewitness expert and that person testified wonderfully from his view, is he going to argue Mr. Veliz wasn't there? I don't know. That's going to be a challenging strategy to argue that he wasn't there . . . So I just do not see the expert eyewitness issue as being withdrawing of a defense. It is a strategy that people can second-guess, as with all strategies can be second-guessed. But I don't even see the dots being connected between the expert not coming and some argument that couldn't be made or wasn't made. I don't see it. Everything you're talking about so far, the jury heard and considered."

Thus, while the identification of Veliz as the shooter was the key element of the People's case, this was not a situation where eyewitnesses with no prior contact with Veliz identified him as the perpetrator. Rather, multiple eyewitnesses who identified Veliz as being present at the scene were familiar with him prior to the shooting. Martinez was the witness most familiar with Veliz. Veliz had visited Martinez's home four or five times. During those visits, Martinez had friendly interactions with Veliz and his girlfriend, Rojas, and cooked food for them. Luna also saw Veliz and Rojas on four prior occasions when they visited the residence, and he was able to observe them together as they socialized with other people. While Walter had never met Veliz or Rojas, he saw Veliz arriving at the residence on one occasion a few months before the shooting.

In addition, Veliz attended the barbeque on the day of the shooting, and he spent time standing near the other guests while Rojas inquired about Monge. Each witness who was present at the barbeque thus had an opportunity to observe Veliz for a period of time before the shooting occurred, and similarly recalled he had long hair tied back in a ponytail. The witness who saw a man dispose of the gun right after the shooting also recounted that the man had a ponytail. Given that the majority of witnesses who identified Veliz had some degree of contact with him prior to the shooting, it was not reasonably probable that expert testimony on the psychological factors affecting eyewitness identifications would have resulted in a different outcome at trial.

Veliz nevertheless contends that an eyewitness identification expert "was essential to explain the contamination of the eyewitness testimony stemming from discussions and the

28

dissemination of [Veliz's] photo, and how that corrupted the witnesses' subsequent identifications." Veliz notes that, in discussing the case with Becker, Dr. Eisen expressed his opinion that Martinez had contaminated the identification process by showing the witnesses the photo of Veliz that she had found on Rojas's Facebook page. However, Becker challenged the eyewitness identifications on this basis in cross-examination. In particular, Becker elicited testimony from Detective Sherman that, prior to her showing the six-pack photographic lineup to the witnesses, a number of them had already seen the Facebook photo of Veliz that was being circulated among the group. Becker also addressed the likelihood of contamination in the identification process during his closing argument to the jury, asserting: "We could use different words for what the impact of using social media to pull a picture off and show to everybody after a crime could do to contaminate or taint an investigation, but[ ] [is] very clear that that's what happened here. That these people . . . many of whom were intoxicated, or had a very limited opportunity to see the shooter, were influenced by having been presented with the photograph of Luis Veliz. I think it has the effect of undermining the quality of the identifications made here."

As the trial court found, the issue of potential contamination in the identification process was therefore presented to the jury. While Veliz argues that expert testimony on the factors affecting memory could have aided the jury in understanding this issue, he has not shown that the outcome of his trial would have been any different had such testimony been presented. As the trial court aptly stated: "There were too many complex issues of identification – who played what role, who was

present, other circumstantial evidence of Mr. Veliz's presence – that a pure I.D. discussion of the theories of memory and suggestibility would have made no difference. The jury, using knowledge within their own skill and competency, weighed all of these topics." Because it is not reasonably probable that the jury would have reached a more favorable verdict had an eyewitness identification expert testified, Becker's failure to call such an expert did not constitute ineffective assistance of counsel. (*In re Alvernaz* (1992) 2 Cal.4th 924, 945 ["even if counsel's performance was deficient, petitioner has failed to sustain his burden on the issue of prejudice"].)

b. *Failure to call a gang expert*

Veliz further argues Becker was ineffective in failing to call gang expert Flores. Veliz asserts the decision to forego the use of a gang expert was "irrational" because the "decision effectively conceded the truth of the gang enhancements."

The record reflects, however, that Becker had a rational tactical basis for deciding not to call Flores as a witness. As Becker explained at the hearing on the new trial motion, Flores was prepared to testify that there may have been a personal motive for the shooting because Monge had a prior conflict with Veliz's girlfriend, Rojas. Flores's proffered opinion thus could support the defense that Veliz was not acting for the benefit of the gang when he committed the shooting. However, Becker was reasonably concerned that, if credited by the jury, Flores's testimony about a personal motivation would offer an "alternative mechanism to convict" for the substantive offenses of attempted murder and assault with a firearm. As the trial court found: "I would hardly find it ineffective assistance of counsel to decide not to bring in an expert who says, yeah, this sounds more

30

like someone who is trying to stand up for the honor of his girlfriend, and therefore it's a personal beef and that's why he tried to kill him and had nothing to do with the gang. Because [the prosecutor] could easily say, yeah, that may have been a big factor when the gang decided to discipline him, they chose somebody from the gang they knew didn't like him because he would be happy to do it. It's kind of a two for one, out of discipline for the gang and revenge for the girlfriend."

Becker therefore made a reasonable tactical choice to forego the use of a gang expert whose testimony could support a defense to the gang allegations, but would risk bolstering the underlying charges by further suggesting a personal motive for the shooting. "'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.'" (*People v. Woodruff* (2020) 5 Cal.5th 697, 762.)

### c. *Failure to call a DNA and fingerprint expert*

Veliz also challenges Becker's decision not to call DNA and fingerprint experts or to conduct independent testing of evidence found at the crime scene. Veliz contends additional testing of the firearm and beer bottles could have shown there was no forensic evidence tying Veliz to the shooting, strengthening the defense that he was not the shooter.

The People conceded in their case-in-chief that the forensic evidence did not connect Veliz to the shooting.[7] Calling a defense

---

[7]     In his opening statement, the prosecutor conceded: "There was extensive testing done, DNA testing, fingerprint testing on beer bottles at the location. There were approximately 20 bottles at the location. The evidence will be unclear if Mr. Veliz actually ever touched any of these bottles. However, they were tested and you're going to hear that none of the fingerprints came back to

31

expert to confirm what the People's experts already had conceded would not have added anything useful to the defense. (*People v. Doolin* (2009) 45 Cal.4th 390, 424 [where no evidence suggested shooter left behind blood at crime scene, "counsel could reasonably have decided a blood analysis expert would contribute nothing to the defense"]; *People v. Adkins* (2002) 103 Cal.App.4th 942, 952 [defense counsel "is not remiss for failing to present additional scientific or medical evidence rather than relying upon the opinions of the prosecution experts where there is no cause to suspect that additional expert testimony or evidence would lead to a different conclusion"].) Moreover, when Becker consulted with a fingerprint expert, he was told that cold beer bottles and certain parts of a firearm were not conducive to retaining prints. Based on that information, Becker believed calling a forensic expert might hurt the defense because the expert's "benign explanation" could bolster the prosecution's argument that the absence of Veliz's prints or DNA did not exclude him as the perpetrator. Becker thus had sound strategic reasons for his decision. (See *Harrington v. Richter* (2011) 562 U.S. 86, 109 ["[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates"].)

---

Mr. Veliz and that the DNA, at best, is inconclusive. There is no DNA that anybody going to say came back to him. You're going to learn that some DNA's are of such poor quality that they can't really determine if it comes to somebody or it does not come to somebody or if it's such small amount that they can't match it to somebody. The firearm itself was also analyzed and you are going to hear that they swabbed it for DNA and that there was no human DNA on the gun and that there was a fingerprint on that firearm that did not belong to Mr. Veliz."

Regarding Veliz's claim that the failure to conduct independent testing of the evidence constituted ineffective assistance, as the California Supreme Court has explained: "More is required than a mere possibility that timely retesting might have yielded favorable evidence. There must be a reasonable probability that such evidence would have been produced. Defendant cannot make such a showing. He does not establish that the serological testing by the police in this case was inaccurate, or that his own tests were likely to produce a different result. Accordingly, we must conclude there was no ineffective assistance. To hold otherwise would be to establish a perverse system of incentives: defense counsel would have the choice of retesting physical evidence on some undetermined possibility that it might yield a result favorable to his client, or not retesting, with a high probability that any conviction of his client would therefore be overturned." (*People v. Kaurish* (1990) 52 Cal.3d 648, 689-690.) Here, Veliz has not established that the prosecution's forensic testing was inaccurate, or that his own testing likely would produce a more favorable result. Veliz accordingly cannot show prejudice.

d. *Veliz's consent to proceed without experts*

Veliz argues Becker provided ineffective assistance when he misled Veliz about the availability of, and need for, expert witnesses and the likelihood of prevailing at trial. Veliz asserts Becker's misrepresentations caused him to unknowingly and involuntarily consent to proceed without any expert witnesses.

In support of this argument, Veliz points to various statements that Becker allegedly made when he visited Veliz over the weekend of February 10, 2017 to discuss trial strategy. He claims Becker "misled" him about the reasons for Dr.

Blandon-Gitlin's unavailability when Becker told him that the expert had a family emergency. Veliz also claims Becker "prejudicially misled" him about "the status of the case" and "likelihood of prevailing" when Becker stated that the trial was going well and that they did not need experts. In his testimony at the hearing on the motion for new trial, Becker disputed Veliz's version of events. Becker denied giving Veliz a reason for Dr. Blandon-Gitlin's unavailability, and testified he did not know the reason until he reviewed Veliz's new trial motion. Becker also testified he told Veliz that he "felt we were in a good position," but "wouldn't say we're gonna win this." In his testimony, Veliz admitted Becker "didn't guarantee" anything, but he "did make [Veliz] feel like we're in a good position."

On this record, Veliz has failed to show ineffective assistance of counsel based on Becker's alleged misrepresentations. Even assuming Becker made certain misstatements to Veliz about the status of the case, the likelihood of prevailing, or the need for experts, Veliz cannot demonstrate prejudice. Veliz argues he was prejudiced by Becker's misrepresentations because they led him to consent to proceed without the benefit of expert witnesses. However, the trial court did not find, nor do we, that Veliz's consent defeated his ineffective assistance claims.

Even if Veliz had never consented to Becker's decision to forego the use of experts, he could not prevail on his ineffective assistance claims. As discussed, there was no reasonable probability that Veliz would have obtained a more favorable result if Dr. Blandon-Gitlin, Dr. Eisen, or any other eyewitness identification expert had testified. Any alleged misstatements to

Veliz about Dr. Blandon-Gitlin's availability made no difference in this case. Further, as for the other experts, the record reflects Becker decided not to call these experts because he reasonably decided that, on balance, their testimony could hurt the defense more than it could help it. Becker's decision to forgo such testimony represented a valid tactical choice irrespective of whether Veliz knowingly consented to that choice.

4. *Counsel Retained for the Motion for New Trial Was Not Ineffective*

Veliz contends that Lonnie McDowell, the attorney who represented him in the motion for new trial, also provided ineffective assistance when he failed to introduce evidence of the substantive content of Dr. Blandon-Gitlin's opinions. Rather than elicit testimony from Dr. Blandon-Gitlin about her case-specific opinions, McDowell objected to the expert providing her "ultimate conclusions based on her review of the evidence" at the hearing on the new trial motion. According to Veliz, the "evidence was necessary to show additional prejudice stemming from [Becker's] decision to change experts instead of making an effort to accommodate [Dr. Blandon-Gitlin's] prior commitments by seeking a new trial date."

Veliz has failed to establish an ineffective assistance claim based on McDowell's handling of the new trial motion. The record does not affirmatively demonstrate that McDowell lacked any rational tactical basis for objecting to the admission of Dr. Blandon-Gitlin's case-specific opinions. Instead, in making the objection, McDowell argued the evidence was irrelevant because Becker had testified that he never received a proffer of Dr. Blandon-Gitlin's opinions, and that he replaced her with Dr. Eisen based solely on her unavailability. The trial court agreed

that, under these circumstances, Dr. Blandon-Gitlin's case-specific opinions were not relevant to the issues raised in the new trial motion. The trial court explained: "[T]o demonstrate before me that you could undermine [Dr. Blandon-Gitlin's] opinion on one or two or three witnesses to me is unnecessary because I think that's something that both sides could argue whether or not the expert really could have helped the jury with that. . . . I wanted both sides to know my view that most eyewitness issues should be handled by a jury and are handled by a jury with common sense and life experience. But there are some things where I feel experts contribute meaningfully to things that are different from the way a layperson looks at identification. So it might be an interesting exercise to see what you could do with Dr. Blandon-Gitlin's opinions if she gave them in a case specific way, but I'm thinking it would ultimately not be helpful to my decision to watch that. . . . The defense is saying that . . . by not calling experts to bolster his arguments on I.D., he effectively withdrew that defense. . . . I guess I'm saying you don't have to retry your case or cross-examine a hypothetical case for me to understand what your side is."

Moreover, while Veliz speculates that Dr. Blandon-Gitlin's opinions "would have been helpful to the defense," the record does not disclose the substance of her opinions or whether they were materially different from those provided by Dr. Eisen. A defendant claiming ineffective assistance of counsel "must do more than surmise that defense experts might have provided more favorable testimony." (*People v. Lucas* (1995) 12 Cal.4th 415, 448, fn. 5; see *People v. Medina* (1995) 11 Cal.4th 694, 773 ["[w]e cannot assume from a silent record that particular witnesses were ready, willing and able to give mitigating

36

testimony, nor can we speculate concerning the probable content or substance of such testimony"]; *People v. Jones* (2003) 29 Cal.4th 1229, 1263 [issues requiring review of matters outside the record are better raised on habeas corpus rather than on direct appeal]; *People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267 [a claim of ineffective assistance of counsel relating to "why counsel acted or failed to act in the manner challenged . . . is more appropriately decided in a habeas corpus proceeding"].)  Finally, even assuming Dr. Blandon-Gitlin's opinions were favorable to the defense, Veliz cannot show prejudice.  As discussed, given that multiple eyewitnesses were familiar with Veliz prior to the shooting, it was not reasonably probable that the outcome of the trial or the new trial motion would have been different had Dr. Blandon-Gitlin or any other eyewitness identification expert been called to testify.  (*People v. Mickel, supra,* 2 Cal.5th at p. 198; *In re Alvernaz, supra,* 2 Cal.4th at p. 945.)

> 5.  *Trial Counsel Was Not Ineffective in Failing To File a Motion To Suppress the Eyewitness Identifications*

Veliz argues Becker was ineffective in failing to file a motion to suppress the eyewitness identifications of him as the shooter or to otherwise challenge the admissibility of those identifications at trial.  Veliz asserts Becker should have sought to suppress the identifications because Martinez's actions in sharing Veliz's Facebook photo with other witnesses were so "impermissibly suggestive" that they tainted the identification procedure and denied Veliz due process of law.  This claim fails because the allegedly suggestive identification procedure about which Veliz complains was arranged by Martinez, a private citizen.

37

It is well-established that "'[d]ue process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable.'" (*People v. Avila* (2009) 46 Cal.4th 680, 698; accord, *People v. Sanchez* (2019) 7 Cal.5th 14, 35 ["'A due process violation occurs only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."'"].) The United States Supreme Court has held, however, that the federal due process clause is not implicated where the allegedly suggestive identification procedure was not arranged by the police. (*Perry v. New Hampshire* (2012) 565 U.S. 228, 232-233 (*Perry*.) In *Perry*, the high court explained that application of the due process clause "turn[s] on the presence of state action and aim[s] to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array." (*Id.* at p. 233.) "When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." (*Ibid.*; see *People v. Thomas* (2012) 54 Cal.4th 908, 931.)

In this case, there was no indication of police involvement in the allegedly suggestive identification procedure. Rather, the evidence showed that Martinez acted on her own when she searched Rojas's Facebook page, found a photo of Veliz, and shared that photo with the other witnesses. Because a due

38

process challenge to the identification procedure arranged by Martinez would have been futile, Becker was not ineffective in failing to file a motion to suppress or to otherwise object to the eyewitness identification evidence on those grounds. (*People v. Caro* (2019) 7 Cal.5th 463, 489 [where defendant "fail[ed] to establish that a motion to suppress [evidence] would have been meritorious," he could not show his counsel was ineffective in failing to bring such motion]; *People v. Bell*, *supra*, 7 Cal.5th at p. 126 ["[a] decision not to pursue futile or frivolous motions does not make an attorney ineffective"].)

### 6. *Trial Counsel Was Not Ineffective in Agreeing To Redact the Writing on Veliz's Photo*

Veliz contends Becker provided ineffective assistance when he agreed to crop the word "WANTED" from the photo of Veliz that Martinez shared with other witnesses. The record reflects that the original photo that Martinez obtained from Rojas's Facebook page was in the nature of a western style "Wanted" poster that was generated using a photo of Veliz and a website application. The word "WANTED" was printed at the top of the photo and the words "Drifters 13" were printed at the bottom. Becker sought to redact the words "Drifters 13" from the photo as unduly prejudicial, but sought to retain the word "WANTED" because it was "an added component to the suggestiveness of the picture." The trial court ruled that either the photo would be shown to the jury in its entirety, or the words on both the top and bottom of the photo would be redacted. Becker and the prosecutor agreed to crop the words "WANTED" and "Drifters 13" from the photo, leaving only the image of Veliz.

Veliz asserts Becker should have agreed to show the jury the complete photo with all of the printed words retained. Veliz

argues that, by agreeing to crop the word "WANTED," Becker withdrew a potentially meritorious defense that the witnesses only identified Veliz as the shooter because Martinez showed them a suggestive photo depicting him in a "Wanted" poster. Becker reasonably concluded that the harm from leaving the gang designation on the poster outweighed any benefit from having the word "WANTED" remain on the poster. Further, as the trial court observed, it was not reasonably likely the jury would have viewed the unredacted photo as suggesting Veliz was guilty of any crime. Rather, the jury likely would have recognized the "Wanted" poster framing for what it was—"an old time format, colorful way of showing his picture." Accordingly, even if the photo had been shown to the jury in its entirety, there is no reasonable probability Veliz would have obtained a more favorable verdict.

> 7. *Trial Counsel Was Not Ineffective in Failing To Argue that the Ongoing Organization Element of the Gang Enhancements Was Not Met*

At the close of the evidence, Becker brought a motion for acquittal "as to all counts . . . and all special allegations" under section 1118.1, which the trial court denied. On appeal, Veliz claims Becker was ineffective in making the motion because Becker failed to argue that the evidence was insufficient to establish the "ongoing organization" element of the gang enhancements, as defined in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*). This claim fails.

To obtain a true finding on a gang enhancement allegation, the People must prove the defendant committed the charged crime "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote,

40

further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) A "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [*id.*, subd. (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in a pattern of criminal gang activity." (*Id.*, subd. (f).) A "pattern of criminal gang activity" means "the commission of attempted commission of conspiracy to commit, . . . or conviction of two or more of the [enumerated] offenses, provided . . . the offenses were committed on separate occasions, or by two or more persons" within a statutorily defined time period. (*Id.*, subd. (e).)

In *Prunty, supra*, 62 Cal.4th 59, the California Supreme Court considered "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Id.* at p. 67.) The prosecution in that case presented evidence the defendant identified as a member of the Sacramento-area Norteño gang. However, the prosecution's predicate offenses evidence pertained to activities of two Norteño subsets, of which the defendant was not a member. The prosecution's gang expert did not "offer any specific testimony contending that these subsets' activities connected them to one another or to the Sacramento Norteño gang in general." (*Ibid*.)

The Supreme Court held the lack of a connection between the subsets and the larger Norteño gang precluded application of the gang enhancement, stating: "[W]hen the prosecution seeks to prove the street gang enhancement by showing a defendant

41

committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Prunty*, *supra*, 62 Cal.4th at pp. 67-68.)  As the Court explained: "That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group.  Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together.  And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization.  [¶] Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f)−i.e., that the group committed the predicate offenses and engaged in criminal primary activities−and that the defendant sought to benefit under section 186.22(b)." (*Prunty*, *supra*, 62 Cal.4th at pp. 71-72, fns. omitted.)

Here, in contrast to the Norteño gang in *Prunty*, which had 1,500 members spread "all over Sacramento" with "a lot of subsets" (*Prunty*, *supra*, 62 Cal.4th at p. 69), Officer Molina, the People's gang expert, testified the Drifters were "all one single gang."  The Drifters only had about 100 members and claimed a well-defined territory within the city of Los Angeles.  While the Drifters included several smaller cliques, each with 10 to 15 members, the cliques all got along with one another and shared common rivals and common identifying symbols.  (*Id.* at pp. 78-79 ["evidence that shows subset members have communicated,

worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang"].)

It is true that both Monge and Pereira, the two Drifters gang members who committed the predicate offenses, belonged to the 12th Street Bagos clique, whereas Veliz belonged to the Picos Logos clique. However, the evidence showed that these cliques were not separate entities, but rather were parts of a common organization whose members acted for the benefit of the larger gang. Moreover, the prosecution's theory was that Veliz was a Drifters gang member who committed the shooting in this case for the benefit of the Drifters, not for any particular clique within the gang. Because there was substantial evidence from which the jury could conclude that the Drifters were a single "ongoing organization, association or group," Becker was not ineffective in failing to argue this specific element of the gang enhancements in the section 1118.1 motion.

8. *Trial Counsel Was Not Ineffective in Cross-Examining the Prosecution's Gang Expert About the Alleged Predicate Offenses*

Veliz contends Becker was ineffective when he cross-examined Officer Molina about the predicate offenses required to establish the "pattern of criminal gang activity" element of the gang enhancements. Veliz specifically claims that, during his cross-examination of Officer Molina, Becker elicited inadmissible hearsay in violation of in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Veliz is incorrect.

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) In

43

*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held the Sixth Amendment right of confrontation bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53-54.) In *Sanchez*, the California Supreme Court considered the extent to which *Crawford* limits an expert witness from relating case-specific hearsay in explaining the basis for an opinion, and addressed the proper application of California hearsay law to the scope of expert testimony. (*Sanchez*, *supra*, 63 Cal.4th at p. 670.) The *Sanchez* Court held the gang expert's case-specific statements, presented as true and without the requisite independent proof, constituted inadmissible hearsay under California law. (*Ibid.*) The Court also held that admission of such statements violates the right to confrontation if the statements were testimonial and "the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, were not satisfied." (*Id.* at p. 680.)

With respect to California hearsay law, the *Sanchez* Court drew a distinction between "an expert's testimony regarding his general knowledge in his field of expertise" and "case-specific facts about which the expert has no independent knowledge." (*Sanchez*, *supra*, 63 Cal.4th at p. 676, italics omitted.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) Traditionally, "an expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds." (*Ibid.*) Thus, "[g]ang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude

44

given by the Evidence Code.  They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven." (*Id*. at p. 685.)  On the other hand, "[w]hat an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.)[8]

In this case, the People sought to prove the "pattern of criminal gang activity" element of the gang enhancements through evidence of a predicate offense committed by Monge on

---

[8]     There is a split of authority as to whether a gang expert's testimony about predicate offenses offered to establish a gang's pattern of criminal gang activity involves "case-specific facts" within the meaning of *Sanchez*.  Some courts have concluded that facts pertaining to predicate offenses are necessarily case specific, and therefore, when an expert "testified that various persons admitted to being members of the [gang], he related hearsay to prove case specific facts." (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 583, 588-589; accord, *People v. Lara* (2017) 9 Cal.App.5th 296, 337.)  Other courts have held that facts concerning predicate offenses are more appropriately characterized as "background information" because "they are historical facts related to the gang's conduct and activities." (*People v. Blessett* (2018) 22 Cal.App.5th 903, 944-945, review granted Aug. 8, 2018, S249250; see *id*. at p. 945) [because "a gang's '"operation, primary activities, and pattern of criminal activities"' are background facts, not case-specific facts, under *Sanchez* and a gang expert is permitted to testify about such things, even if that testimony is based on hearsay sources"]; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411.)  The issue currently is pending before the Supreme Court. (See *People v. Garcia*, review granted Oct. 17, 2018, S250670 and *People v. Valencia*, review granted Oct. 17, 2018, S250218.)

May 5, 2013, and a predicate offense committed by Pereira on May 15, 2013. The People's evidence consisted of certified court records reflecting the convictions of Monge and Pereira for these respective offenses, and Officer Molina's testimony that Monge and Pereira were both members of the Drifters gang. On cross-examination, Becker asked Officer Molina if he knew whether the offense committed by Monge was done for the benefit of the gang. Officer Molina answered he did not know. Becker then asked Officer Molina if he knew whether Pereira's offense "was done for gang purposes." When Officer Molina again responded he did not know, Becker asked if he had "seen docket on the case." Officer Molina confirmed he had seen the docket, and had "also reviewed the report and spoken to the officers that took down those reports." Becker again inquired if Officer Molina had "any personal knowledge" whether Pereira's offense was done for the benefit of the gang. Officer Molina answered it was his opinion that the offense was done for the gang's benefit.

Contrary to Veliz's contention, Officer Molina did not relate any inadmissible case-specific hearsay in responding to these questions. Officer Molina's testimony that he reviewed the docket and police reports did not reveal any case-specific facts about the content of those records. Likewise, his testimony that he spoke with the officers who "took down those reports" did not convey any out-of-court statements made by those officers or anyone else. As the Supreme Court explained in *Sanchez*, while "an expert cannot . . . relate as true case-specific facts asserted in hearsay statements," the expert "may still rely on hearsay in forming an opinion, and may tell the jury in general terms that he did so." (*Sanchez*, *supra*, 63 Cal.4th at pp. 685–686.) The expert also may tell the jury "generally the kind and source of

46

the 'matter' upon which his opinion rests" so that the jury can "independently evaluate the probative value of an expert's testimony." (*Ibid.*) Officer Molina thus could testify in general terms that he relied on conversations with other officers and on written records such as police reports and court dockets in forming his opinions. Becker did not introduce "inadmissible testimonial hearsay in violation of *Sanchez.*" While Becker's questioning of Officer Molina about the predicate offenses failed to yield favorable testimony, it did not constitute ineffective assistance of counsel.

### 9. *Trial Counsel Was Not Ineffective in Failing To Object to Alleged Prosecutorial Misconduct*

Veliz asserts Becker provided ineffective assistance in failing to object to multiple instances of prosecutorial misconduct during closing argument. Veliz argues the prosecutor committed misconduct in his argument to the jury by: (1) referring to a hypothetical given by the trial court during jury voir dire and implying it was evidence; (2) commenting on Veliz's failure to testify; and (3) denigrating defense counsel while vouching for his own version of the truth.

""'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."'" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332.) Where, as here, "a claim of misconduct is based on the prosecutor's comments before the jury, . . . "'the question is

whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.""" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)  "'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Flores* (2020) 9 Cal.5th 371, 403.)

""""To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.'" [Citation.]  A court will excuse a defendant's failure to object only if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct." (*People v. Jackson* (2016) 1 Cal.5th 269, 349.)  Where a prosecutor's statement does not constitute prejudicial misconduct, defense counsel's failure to object to the statement is not ineffective assistance of counsel.  (*People v. O'Malley* (2016) 62 Cal.4th 944, 1010, fn. 12; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1333-1334.)

> a. *The prosecutor did not improperly rely on a hypothetical used by the trial court in voir dire*

Veliz contends the prosecutor committed misconduct by referring to a hypothetical example given by the trial court during jury voir dire to explain circumstantial evidence.  Veliz claims this was improper because the court's hypothetical was not evidence, and using it gave the prosecutor "unwarranted credibility by association."

During voir dire, the trial court explained to the jurors that DNA and fingerprints constitute circumstantial rather than

direct evidence.  To illustrate that point, the court gave the following hypothetical:  "[L]et's say, I'm the person.  And I touched the bench like this.  Now, you are seeing me do that.  That is direct evidence, if you saw the judge touch the bench. . . . If I leave and someone comes in and finds my DNA, maybe even my fingerprints right there, they would say I found his DNA.  I found his fingerprints there.  And then the jury would conclude circumstantially that I must have touched it."

In his closing argument, the prosecutor told the jury that "[e]vidence is the sworn testimony of witnesses and the exhibits admitted into evidence," and that "[n]othing we say is evidence."  The prosecutor then stated:  "Direct and circumstantial evidence.  We talked about this a little bit in the context of physical, D.N.A., fingerprint evidence.  All right.  Both direct and circumstantial evidence are acceptable types of evidence.  The judge -- when the judge told you earlier -- or when we were talking in voir dire, there was an example of D.N.A. left on . . . or a fingerprint left on the judge's bench.  D.N.A. or fingerprints are what we call circumstantial evidence.  All right.  And we call them circumstantial evidence because they don't directly prove anything, if you think about it.  I mean, they have strong suggestions or inferences that you can draw from them, but just because my D.N.A. is on this bench doesn't mean I was actually even here; right?  This could have gotten there from a different way.  It could have been transferred from myself to another person.  I could cough or something.  I could be in the general vicinity.  There's lots of reasons why your D.N.A. could be somewhere, even though you weren't there."

"'Prosecuting attorneys are allowed "a wide range of descriptive comment' and their ""'argument may be vigorous as

49

long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.""'"" (*People v. Jackson*, *supra*, 1 Cal.5th at p. 349.) Prosecutors also "may draw from matters that are ""'"not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature."'"'" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 289.) "The use of hypotheticals is not forbidden and there is no misconduct when . . . '[n]o reasonable juror would have misunderstood the expressly hypothetical examples to refer to evidence outside the record.'" (*People v. Mendoza* (2016) 62 Cal.4th 856, 907.)

Here, the prosecutor used a hypothetical to illustrate the difference between direct and circumstantial evidence. In fact, by referring to the trial court's own prior hypothetical in voir dire, the prosecutor made clear that he was merely giving an "example" of how the presence of a person's DNA on a bench could be circumstantial evidence that the person had touched the bench. The prosecutor never suggested the jury should consider facts outside the record, nor did his use of the hypothetical invite the jury to rely on the prestige of the government rather than its own evaluation of the evidence. Because no reasonable juror would have misunderstood the hypothetical to refer to facts outside the record, there was no misconduct. (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 907 [no misconduct where "prosecutor compared the facts of the case with common, obviously hypothetical scenarios that jurors readily could posit for themselves"]; *People v. Davis* (1995) 10 Cal.4th 463, 538 [use of hypotheticals not misconduct where "[t]here was no suggestion by the prosecutor that he was referring to factual information outside the record; nor did his use of hypothetical examples

improperly use the prestige of the district attorney's office to convince the jury to return a verdict of death"].)  Becker was not ineffective in failing to object to the prosecutor's hypothetical. (See *People v. O'Malley, supra,* 62 Cal.4th at p. 1010, fn. 12 ["[b]ecause we find either no misconduct, or, assuming misconduct, no prejudice, counsel's failure to object was not ineffective assistance"]; *People v. Castaneda, supra,* 51 Cal.4th at pp. 1333-1334 [where prosecutor's statement did not constitute misconduct, "defense counsel had no basis for objecting to the statement, and was not deficient for declining to do so"].)

b. *The prosecutor did not improperly comment on Veliz's failure to testify*

Veliz next asserts the prosecutor committed misconduct by commenting on Veliz's failure to testify in violation of *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).  In support of this claim, Veliz points to the following argument by the prosecutor in his rebuttal:  "There was a couple of things that I think are problematic for the defense in their argument.  One was they never disputed that [Rojas] was there.  And if [Rojas] was there, folks, it makes a whole lot of [sense] why Luis Veliz was there. And the other issue is they never—now, they don't have any kind of burden, all right.  They didn't have to provide an explanation. But they didn't provide you with an explanation of what happened that day.  They didn't say he was there, or he wasn't there.  They didn't say he was there, then he left and then he came back.  Or he was there, he left, and then left and somebody else came back.  There was no logical explanation for what happened that day from the defense, in their argument."

The Fifth and Fourteenth Amendments to the United States Constitution "forbid[] either comment by the prosecution

51

on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin*, *supra*, 380 U.S. at p. 615, fn. omitted; see *People v. Castaneda*, *supra*, 51 Cal.4th at p. 1333.) "'[A] prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided only by the defendant, who therefore would be required to take the witness stand.'" (*People v. Thomas*, *supra*, 54 Cal.4th at p. 945.) "However, not every statement made before a jury that touches on one defendant's rights to silence and representation amounts to a constitutional violation. For example, a prosecutor is permitted to comment on the state of the evidence and the defendant's failure to call a logical witness, despite the mere possibility that the statement might also be interpreted as a reference to the defendant's failure to testify." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 387.)

In this case, the prosecutor's comments did not constitute *Griffin* error. When viewed as a whole and in context, the prosecutor's remarks were directed at what he perceived to be deficiencies in defense counsel's closing argument to the jury, and in particular, the failure of defense counsel to provide a "logical explanation for what happened that day . . . in their argument." Although Becker had argued to the jury that Veliz was not the shooter, he did not explain whether the defense theory was that Veliz was at the barbeque but left before the shooting, or was never there at all. Becker also did not address whether the witnesses were wrong when they identified Veliz's girlfriend Rojas, as being present. In his rebuttal, the prosecutor focused on these gaps in Becker's argument. While the prosecutor used the words "they" and "their" in his comments, it

seems clear this was a generic reference to the defense rather than to Veliz himself.  Indeed, the prosecutor began this portion of his rebuttal by stating there were problems "for the defense in their argument."  He then concluded by again referring to "the defense, in their argument."  Because the prosecutor did not comment on Veliz's failure to testify, he did not commit *Griffin* error.  (*People v. Medina, supra,* 11 Cal.4th at p. 756 [no *Griffin* error where "prosecutor's comments were directed to the general failure of the defense to provide an innocent explanation as to why defendant was armed" and "contained no references, express or implied, to defendant's own silence"].)  Becker was therefore not deficient in failing to object to the prosecutor's comments.  (*People v. O'Malley, supra,* 62 Cal.4th at p. 1010, fn. 12; *People v. Castaneda, supra,* 51 Cal. at pp. 1333-1334.)

   c. *The prosecutor did not denigrate defense counsel or engage in improper vouching*

Veliz also argues the prosecutor committed misconduct by disparaging defense counsel while impermissibly vouching for his own personal view of the evidence.  Veliz identifies three instances in the prosecutor's rebuttal argument that he claims constituted improper denigration and vouching.

First, the prosecutor stated in his rebuttal:  "And so I think it's just not using your common sense when the defense says it's reasonable doubt to say that Walter Lopez and Christian Lopez heard three shots, but there were only two shots fired, and that's reasonable doubt.  I think that it becomes disingenuous when the argument is made, from a commonsense standpoint.  It becomes even more disingenuous, borderline offensive, when he says that Christopher Luna couldn't even see out of his window.  That it was blocked -- the window was blocked.  And you look at the

photographs, it's inconclusive.  I looked at the photographs.  It's inconclusive, I think, whether or not they're blocked or not."

Later in his rebuttal, the prosecutor told the jury:  "So you're going to have to believe that all of these people, that have identified Mr. Luis Veliz, are either mistaken or they are lying.  And a conspiracy issue, I think, is laughable.  I don't see why anybody would have -- any of these people, who, for the most part, seem to be good individuals, would have any type of animus towards Luis Veliz to have a conspiracy to get him.  So I think the defense argument has to be that they are mistaken.  And if the defense is they're mistaken because they thought three shots [were fired] and there were actually two, or they thought he got into a car, but he actually ran away—if those are the types of inconsistencies that you were willing to disregard the other testimony, I just don't think it makes sense."

Near the conclusion of his rebuttal, the prosecutor argued:  "Luis Veliz went into the backyard to assassinate one specific individual, Daniel Monge.  And if you're asking for an explanation, I think it's relatively simple.  Daniel Monge had fallen out of favor with the gang.  And who better to kill Daniel Monge than the guy whose girlfriend Daniel Monge had talked trash about."

"'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.' [Citations.]  'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Edwards* (2013) 57 Cal.4th 658, 738.)  "Improper vouching occurs when the prosecutor either

(1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument." (*People v. Anderson* (2018) 5 Cal.5th 372, 415.) However, "'"[a] prosecutor is given wide latitude to vigorously argue his or her case"' [citation] and '"may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom.'"'"" (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

In this case, there was no misconduct. The prosecutor did not cast aspersions on defense counsel or attack his personal integrity. Rather, the prosecutor made the challenged remarks in the context of rebutting a point that defense counsel had raised during his closing argument. While some of the words used by the prosecutor, such as "disingenuous," "offensive," and "laughable," were harsh and not appropriate language for a closing argument, they did not rise to the level of misconduct. Further, the prosecutor directed the statements solely at defense counsel's arguments and characterization of the evidence, and not at him personally. On this record, there is no reasonable likelihood the jury would have construed the comments in an objectionable manner. (*People v. Charles* (2015) 61 Cal.4th 308, 328-329 [prosecutor's statement that "'I tip my hat to the job the defense did in this case when they had no evidence that went their way'" was not misconduct because it "'was aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally'"]; *People v. Cole* (2004) 33 Cal.4th 1158, 1203 [no prosecutorial misconduct where "it is not reasonably likely that the jury understood the prosecutor's references to defense counsel as 'deceiv[ing],' 'unfair,' 'misleading,' or 'tricky' to

be personal attacks on counsel's integrity"].)

Veliz also has failed to show impermissible vouching. The prosecutor's comments about what the witnesses were able to see and whether they had a motive to lie were based solely on evidence contained in the record. The prosecutor did not express any personal belief in the witnesses' veracity, nor did he suggest that there was evidence available to the government, but not presented to the jury that supported the witnesses' credibility. The prosecutor also did not imply the jury should adopt his view of the evidence based on his position, reputation, or experience. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207 [no improper vouching occurred where "[t]he prosecutor was not suggesting there was evidence the prosecutor knew outside of the record or that the jury should personally trust him because of his position"].) In sum, because the prosecutor did not commit misconduct in making the challenged arguments, Becker's failure to object to those arguments was not ineffective assistance of counsel. (See *People v. O'Malley*, *supra*, 62 Cal.4th at p. 1010, fn. 12 ["[b]ecause we find either no misconduct, or, assuming misconduct, no prejudice, counsel's failure to object was not ineffective assistance"]; *People v. Castaneda*, *supra*, 51 Cal.4th at pp. 1333-1334 [where prosecutor's statement did not constitute misconduct, "defense counsel had no basis for objecting to the statement, and was not deficient for declining to do so"].)

B. *The Trial Court Did Not Err in Admitting Evidence of Monge's Refusal to Comply with a Gang Directive*

Veliz asserts the trial court erred in admitting evidence of Monge's statement to Detective Sherman that a prison inmate had directed him to sell drugs and he had refused. Veliz argues, "[T]he prosecution introduced evidence that Monge declined to

56

sell drugs for the Drifters and the shooting was in retaliation for his refusal." Veliz specifically argues that the "inmate's statement constituted testimonial hearsay" in violation of the Evidence Code and the Sixth Amendment right of confrontation.

1. *Relevant Background*

During Monge's testimony, the prosecutor asked Monge whether he had received a call from a gang member in prison requesting that he "do something." Monge denied receiving such a call, stating: "No, I didn't." Although he remembered the hospital interview with Detective Sherman was recorded, Monge could not recall the details of the interview. After refreshing Monge's recollection with the transcript of the interview, Monge testified that he was telling the detective during the interview "what she wanted. Basically she was answering her own questions. I was just agreeing with her." The prosecutor asked Monge again whether he received a phone call from "somebody upstate."[9] Monge responded, "[He] didn't talk to [anybody] upstate and that he did not "associate with none of the homies, so why would [he] want to talk to somebody upstate?" The prosecutor asked Monge what he had told Detective Sherman "about the phone call." Defense counsel objected on hearsay grounds.

In a sidebar conference, the prosecutor explained that Monge had told the detective that a prison inmate had called him and instructed him to sell drugs for the gang. Defense counsel argued the inmate's statement was being offered for the truth of the matter stated to establish motive for the shooting, and not to show Monge's state of mind. Defense counsel noted that Monge's

---

[9]     According to Monge, "upstate" meant "prison."

57

state of mind was not relevant to any issue in dispute.  Defense counsel also argued that admission of the statement presented a "*Crawford* problem" because he could not examine the inmate.  The prosecutor asserted the inmate's statement was not "even hearsay" because it was "a request or demand."  The prosecutor argued that "a request or command . . . is not hearsay, it's not a statement offered to prove the truth of the matter asserted."

The trial court ruled that the evidence was admissible, stating in relevant part:  "You can certainly cross-examine the witness [Monge] who says it was given.  He might say I made all this up to get the detective to leave.  No one called me, there's no reason to discipline me, and I was under no fear.  I didn't believe anyone wanted me to sell. . . . It gives [Monge] a state of mind that would explain his conduct and circumstantially provide a motive to whoever in the gang wanted him to do this, to act on it, which I imagine some gang expert . . . would say is a basis for discipline, including the most severe discipline.  So the objection will be overruled."

When Monge's testimony resumed, Monge stated he did not remember "ever talking" to anyone in prison.  He admitted, however, that he told Detective Sherman that a prison inmate had asked him "to sell something," which for a Drifters gang member meant "to sell narcotics."  When asked what he said in response to the request, Monge testified he had said "yeah."  Monge then admitted he told the detective that he "actually said no to the request."  Monge testified that what he told the detective was "false" because he did not "remember ever talking to [anyone] upstate."

Immediately after this testimony, the trial court instructed the jury: "So ladies and gentlemen, sometimes evidence is admitted for a limited purpose. Often this happens when the right of the defendant to confront some speaker is not present. So if we had the person that placed the call, who could be asked did you say that, what did you mean, et cetera, then that could be used in one way. The purpose for this testimony is not to prove that a person wanted any particular thing, but it does prove that this witness may have thought something based on what he heard. That's if you believe he actually heard it. If you accept the different version that that never occurred and he said it for a different reason, that's up to you. But we call that the effect on the listener. So the effect on the listener is the purpose it's being used, not to prove what the speaker intended."

2. *Standard of Review and Applicable Law*

A trial court is vested with broad discretion in ruling on the admissibility of evidence. (*People v. Fayed* (2020) 9 Cal.5th 147, 189.) "'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice."'" (*People v. Young* (2019) 7 Cal.5th 905, 931; see *People v. Clark* (2016) 63 Cal.4th 522, 590 ["[t]he standard of review for the court's [evidentiary] ruling, along with its determination of issues concerning the hearsay rule, is abuse of discretion"]; *People v. Jones* (2013) 57 Cal.4th 899, 956 ["a trial court's decision to admit or exclude a hearsay statement . . . will not be disturbed on appeal absent a showing of abuse of discretion"].) "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence

upon a different theory, a mistaken theory, or one not raised below."  (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).)  Unless subject to an exception, hearsay evidence is inadmissible.  (*Id.*, subd. (b).)  However, "an out-of-court statement is hearsay only when it is 'offered to prove the truth of the matter stated.'  [Citation.]  Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated."  (*People v. Jurado* (2006) 38 Cal.4th 72, 117; see *People v. Mayfield* (1997) 14 Cal.4th 668, 741, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2 ["pleas for help, were not hearsay because they were not admitted for the truth of the matter stated"]; *People v. Garcia* (2008) 168 Cal.App.4th 261, 289 ["requests and words of direction generally do not constitute hearsay."]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67 ["[a] declarant's words of direction or authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words"].)

Further, a witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement.  (Evid. Code, §§ 770, 1235; *People v. Coffman* (2004) 34 Cal.4th 1, 78.)  A prior inconsistent statement is admissible not only to impeach a witness's credibility, but also as an exception to the hearsay rule to prove the truth of the matter asserted therein.  (*People v. Fierro* (1991) 1 Cal.4th 173, 221.)  In *People v. Zapien* (1993) 4 Cal.4th 929, the California Supreme Court explained:  "The

reason the prior inconsistent statement of a witness may be received is that the declarant is present in court and *subject to cross-examination*. 'The witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. The reasons for the change of face, whether forgetfulness, carelessness, pity, terror, or greed, may be explored by the two questioners in the presence of the trier of fact, under oath, casting light on which is the true story and which the false. It is hard to escape the view that evidence of a prior inconsistent statement, when declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony." (*Id.* at p. 952.)

A defendant's Sixth Amendment right to confront and cross-examine a witness is not violated when the witness who made the prior inconsistent statement is available for cross-examination. (*Crawford, supra,* 541 U.S. at pp. 59-60, fn. 9; *People v. Friend* (2009) 47 Cal.4th 1, 42, fn. 24; *Fierro, supra,* 1 Cal.4th at p. 222.) In *Crawford, supra,* 541 U.S. 36, the United States Supreme Court held: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Id.* at p. 59, fn. 9.)

### 3. *The Trial Court Did Not Err*

At trial, Monge testified that he did not refuse his gang's request to sell narcotics. However, in his hospital interview with Detective Sherman, Monge admitted receiving the request "to sell something." The admissibility of Monge's testimony therefore

61

involved two levels; between Monge and the prisoner during the telephone call, and Monge's later statements to Detective Sherman in the interview. (See generally Evid. Code, § 1201.) As to the first level, the inmate's request did not constitute hearsay because the request did not assert any fact. The inmate's request was offered to prove that the words were said, not that the words were true. Thus, the inmate's request "was not hearsay but 'simply verbal conduct' consisting of a proposal to perform an act, and therefore was 'neither inherently true nor false.'" (*People v. Cowan* (2010) 50 Cal.4th 401, 472; accord, *People v. Clark, supra,* 63 Cal.4th at p. 592 ["We have often characterized commands not as hearsay but rather as 'simply verbal conduct consisting of a directive that was neither inherently true nor false.'"]; *People v. Curl* (2009) 46 Cal.4th 339, 361, 362 [instruction to "'get rid'" of a pair of boots "was not hearsay but simply verbal conduct consisting of a directive that was neither inherently true or false"].)

Likewise, Monge's response to the inmate's request was not hearsay because it did not involve an assertion of a fact. It was offered to prove that the words were said, regardless of whether they were true. The prosecutor did not offer Monge's testimony to prove that Monge did not sell drugs. Rather, if believed, as Monge recounted to the detective, the exchange between the inmate and Monge showed the gang's belief that Monge had refused its request to sell narcotics. The gang's belief was relevant to show why Veliz, a Drifters gang member, had a motive for shooting Monge, a fellow member of that gang. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 815 ["[a]lthough motive is normally not an element of any crime that the prosecutor must prove, 'evidence of motive makes the crime understandable and

62

renders the inferences regarding defendant's intent more reasonable'"], overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1215.)

As to the second level, by testifying what he had told Detective Sherman in the hospital interview was "false" and denying that there was a gang request to "do something," Monge directly contradicted his prior statement about the exchange with the inmate. Monge's earlier statement to Detective Sherman was therefore admissible as a prior inconsistent statement under Evidence Code section 1235. In accordance with Evidence Code section 770, Monge had "an opportunity to explain or to deny the statement" while testifying. (See *People v. Alexander* (2010) 49 Cal.4th 846, 908 ["[t]hat the requirements of Evidence Code section 770 were met here is undisputed, given that [the witness] was asked directly about the contents of her September statements to [the police detective] during her testimony"]; *People v. Zapien, supra,* 4 Cal.4th at p. 955 [when a declarant admitted the prior inconsistent statement, "the defendant's ability to attack the prior statement may be enhanced, because the witness 'should be more than willing to give the usual suggested explanations for the inaccuracy of his prior statement, such as faulty perception or undue haste in recounting the event"].)[10]

---

[10] Monge's testimony was not admissible under Evidence Code section 1250, which authorizes the admission of out-of-court statements to prove the declarant's then-existing state of mind if the declarant's state of mind "is itself an issue in the action," or if the evidence "is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subds. (a)(1), (2).) Because Monge's state of mind was not relevant to any disputed issue at trial, the state-of-mind exception did not apply. (See *People v.*

63

Monge's testimony did not violate Veliz's Sixth Amendment right of confrontation. As the Supreme Court in *Crawford* explained, the Confrontation Clause addresses the specific concern of "[a]n accuser who makes a formal statement to government officers" because the accuser "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford*, *supra*, 541 U.S. at p. 51; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 39.) As to Monge's exchange with a fellow gang member, the Confrontation Clause was not implicated because there was no hearsay and it was not testimonial. (*People v. McKinnon* (2011) 52 Cal.4th 610, 656, fn. 28 ["[g]iven our conclusion that the gang testimony . . . was properly admitted for a nonhearsay purpose, defendant's claim that his constitutional right to confrontation also fails"]; *People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6 ["*Crawford* made clear that there are no confrontation clause restrictions on the introduction of out-of-court statements for nonhearsay purposes"]; *People v. Sanchez, supra,* 63 Cal.4th at p. 687 ["the term 'testimonial' 'applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed'"].) Regarding Monge's interview with Detective Sherman, because Veliz had the opportunity to confront and cross-examine Monge, the trial court's admission of the statements did not violate Veliz's rights. (*Crawford,* at p. 59, fn. 9 ["when the declarant appears for cross-examination at trial, the

_____

*Flores, supra,* 9 Cal.5th at p. 410; *People v. Jablonski* (2006) 37 Cal.4th 774, 819.)

64

Confrontation Clause places no constraints at all on the use of his prior testimonial statements"]; *People v. Sanchez,* at pp. 679-680 [""The main and essential purpose of confrontation is *to secure for the proponent the opportunity of* cross-examination.'" [Citation.] 'Cross-examination is the principal means by which the believability of a witness and the truth of his [or her] testimony are tested"].)

### C. *Substantial Evidence Supported Veliz's Convictions*

Veliz challenges the sufficiency of the evidence supporting his convictions for attempted murder, assault with a firearm, and possession of a firearm by a felon. Veliz contends substantial evidence does not support the finding that he was the shooter.

#### 1. *Standard of Review*

""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.) "[O]ur task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ""be reasonably reconciled with the defendant's innocence.""

[Citations.] The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)

### 2. *Substantial Evidence Supported the Finding That Veliz Was the Shooter*

In this case, substantial evidence supported a finding that Veliz was the person who committed the shooting. At trial, four different witnesses—Martinez, Luna, Christian, and Walter— identified Veliz as one of the two men who arrived at the barbeque with Rojas. Martinez, Luna, and Walter were all familiar with Veliz prior to the shooting and recalled Veliz had long hair that he typically wore in a ponytail. The witnesses testified that Veliz had a ponytail that day. Two of the witnesses – Christian and Walter – saw the actual shooting, and identified Veliz as the person who walked up behind Monge, pointed a gun directly to the back of his head, and fired at least two shots. Luna identified Veliz as the person who walked away from the residence immediately after the shots were fired. A few minutes after the shooting, Begazo, the school district employee with no connection to Veliz or any of the other witnesses, saw a man with a ponytail run by and discard a gun under a wooden fence. The police recovered a .22-caliber revolver with two spent cartridges from that location. From this evidence, the jury reasonably could have concluded that Veliz was the man with the ponytail who arrived at the barbeque with Rojas, committed the shooting of Monge and Christian, and then fled from the scene and disposed of the gun under the wooden fence.

66

The jury also heard evidence that both Veliz and Monge were members of the Drifters gang. Prior to the shooting, Monge had refused a directive from a prison inmate to sell drugs for the gang. Officer Molina, the prosecution's gang expert, explained that gangs discipline their members for disobeying the rules of the gang, and that such discipline can include shootings. Monge confirmed he often did not follow the leaders of his gang because he did not believe they should have authority over him. Monge further confirmed he did not get along with Rojas, who also was part of the Drifters. From this evidence, the jury reasonably could have concluded that Veliz had a motive to commit the shooting to discipline Monge for the benefit of the gang and/or to seek revenge against Monge for disrespecting Rojas.

Veliz argues the evidence was insufficient to support his convictions because there was no physical evidence linking him to the beer bottles found at the residence or to the gun found under the fence. However, the absence of forensic evidence, such as Veliz's fingerprints and DNA from the crime scene, does not negate the sufficiency of the evidence that he committed the shooting. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1293 ["the absence of forensic evidence such as defendant's fingerprints in the victim's apartment . . . does not negate the sufficiency of the evidence to prove that defendant raped and murdered [the victim]"].) Moreover, the prosecution's forensic experts explained that certain types of surfaces, such firearm grips and bottles with condensation, were not conducive to retaining prints or DNA.

In challenging the sufficiency of the evidence, Veliz further argues the eyewitness identifications of him were inconsistent and unreliable. Veliz points to certain discrepancies in the witnesses' accounts of the shooter's dress and appearance and

67

where the shooter went immediately after the incident.  Veliz also asserts the identifications were the result of the suggestive procedure introduced by Martinez when she showed the witnesses Veliz's Facebook photo.  It is well-established, however, that "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." [Citation.]  Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585; accord, *People v. Gomez, supra,* 6 Cal.5th at p. 280 [""doubts about the credibility of the in-court witness should be left for the jury's resolution""]; *People v. Reed* (2018) 4 Cal.5th 989, 1006 ["sufficiency argument based on the identification procedures attacks the credibility of [the witness's] testimony, which we do not question when considering sufficiency of the evidence so long as the witness's testimony is not inherently improbable"].)

Here, the witnesses' identifications of Veliz as the shooter were neither physically impossible nor inherently improbable.  The jury heard the evidence casting doubt on the credibility of those identifications, and the defense argued those issues at length at trial.  Defense counsel cross-examined the witnesses about their recollection of events surrounding the shooting, the discrepancies in the recollections, and suggestiveness in the identification procedure.  "The final determination as to the weight of the evidence [was] for the jury to make." (*People v. Brown* (2014) 59 Cal.4th 86, 106.)  Because the jury reasonably could have concluded from the totality of the evidence presented

that Veliz was the shooter, substantial evidence supported his convictions.

D. *Substantial Evidence Supported the Gang Enhancement Findings*

Veliz argues that substantial evidence did not support the gang enhancement findings. He specifically contends the prosecution failed to establish the "pattern of criminal gang activity" element of the enhancement because one of the predicate offenses–the robbery committed by Pereira–was based on Officer Molina's hearsay testimony in violation of *Sanchez*. Veliz also claims the prosecution failed to prove the "ongoing organization" element because the evidence did not establish that Veliz and Pereira belonged to the same subset of the Drifters, as required under *Prunty*. These arguments are unavailing.

As discussed, Officer Molina's testimony that he relied on the court docket, police reports, and conversations with other officers in forming his opinion that Pereira's offense was gang-related did not convey any case-specific hearsay in violation of *Sanchez*. Further, Officer Molina's opinion that Pereira committed the predicate offense for the benefit of the gang was not necessary to prove a "pattern of criminal gang activity" under section 186.22. There is no requirement in the statute that the predicate offenses be gang-related. (*People v. Gardeley* (1996) 14 Cal.4th 605, 621 ["[n]othing in [section 186.22's] statutory language suggests an intent by the Legislature to require the 'two or more' predicate offenses to have been committed 'for the benefit of, at the direction of, or in association with' the gang"], overruled on another ground by *Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13; *People v. Thompkins* (2020) 50 Cal.App.5th 365,

69

413, fn. 24 ["[i]t is unnecessary that the predicate offenses have been committed for the benefit of the gang"].) Here, the prosecution presented evidence that two or more members of the Drifters gang each committed an enumerated offense on a separate occasion within the statutory period. (§ 186.22, subd. (e).) This was sufficient to satisfy the "pattern of criminal gang activity" element of the gang enhancements.

Contrary to Veliz's contention, the prosecution also was not required to prove Veliz and Pereira belonged to the same subset of the gang. As discussed, the prosecution presented sufficient evidence to establish an associational or organizational connection between the small cliques that comprised the Drifters gang, as required under *Prunty, supra,* 62 Cal.4th 59. From such evidence, the jury reasonably could infer that Veliz and the gang members who committed the predicate offenses were part of a single criminal street gang, and that Veliz committed the charged offenses for the benefit of that gang. Substantial evidence therefore supported the jury's true findings on the gang enhancements.

### E. *The Trial Court Did Not Err in Instructing the Jury on the Gang Enhancements*

Veliz contends the trial court erred in instructing the jury on the gang enhancements because it failed to sua sponte define the organizational nexus requirement set forth in *Prunty, supra,* 62 Cal.4th 59. Veliz argues: "[T]he prosecution cannot show that [Veliz] intended to benefit one gang while relying upon the predicate offenses of another gang to satisfy the statutory requirements." This claim lacks merit.

70

### 1. *Relevant Law*

A criminal defendant has a right to accurate instructions on the elements of a charged crime or allegation. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) "As a general rule, in the absence of a request for amplification, the language of a statute defining a crime . . . usually is an appropriate basis for an instruction. If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning. If, however, a word or phrase is used in a technical sense differing from its commonly understood meaning, clarifying instructions are appropriate and should be given on the court's own motion." (*People v. Rodriguez* (2002) 28 Cal.4th 543, 546-547; accord, *People v. Krebs* (2019) 8 Cal.5th 265, 331 ["'[w]hen a word or phrase "'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request"'"'].) We review de novo whether an instruction accurately states the law. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *People v. Posey* (2004) 32 Cal.4th 193, 218.)

### 2. *The Trial Court Properly Instructed the Jury on the Elements of the Gang Enhancements*

The trial court instructed the jury on the elements of the gang enhancements with CALCRIM No. 1401, which stated, in relevant part: "If you find the defendant guilty of the crimes charged in Counts one[,] two or three, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang. You must decide whether the People have proved

71

this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] AND [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members. [¶] A *criminal street gang* is any ongoing organization, association, or group of three or more persons, whether formal or informal: [¶] 1. That has a common name or common identifying sign or symbol; [¶] 2. That has, as one or more of its primary activities, the commission of robbery, assault with a deadly weapon or possession of a firearm by a person prohibited, attempted murder, unlawful taking of a vehicle in violation of Vehicle Code section 10851; [¶] AND [¶] 3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity." Veliz did not object CALCRIM No. 1401, or request any clarifying language.

Veliz asserts the trial court had a sua sponte duty to further define the term "criminal street gang." He argues the court should have instructed the jury that, to prove the existence of a criminal street gang, the People had to establish that the organization, association, or group that Veliz sought to benefit was the same one that engaged in the primary activities and pattern of criminal gang activity. However, the trial court's instruction on the definition of "criminal street gang" tracked the language of section 186.22, subdivision (f). In *Prunty*, the Supreme Court construed the phrase "organization, association, or group . . ., whether formal or informal," as used in that subdivision, as "contemplat[ing] some kind of relationship, or degree of 'togetherness,' uniting those individuals." (*Prunty*,

72

*supra*, 62 Cal.4th at p. 72.)  The *Prunty* court did not ascribe a technical meaning to the statutory language, but rather relied on the common understanding of those terms as reflected in dictionary definitions.  (*Id*. at pp. 72-73.)  The court also rejected the argument that it was adding "'an element to the statute that the Legislature did not put there,'" and made clear it was merely interpreting the words of section 186.22, subdivision (f).  (*Prunty,* at p. 76, fn. 4.)  Accordingly, as reflected *Prunty*, the phrase "ongoing organization, association, or group . . . , whether formal or informal" does not have a technical meaning different from its commonly understood meaning.  Because the trial court properly instructed the jury on the elements of the gang enhancements, Veliz's instructional error claim fails.

### F. *Remand Is Warranted To Permit the Trial Court To Consider Whether To Exercise Its Sentencing Discretion*

At Veliz's November 2017 sentencing hearing, the trial court imposed a prison term of life with a minimum parole eligibility of 15 years on the count for attempted willful, deliberate, and premeditated murder, doubled to a minimum parole eligibility of 30 years based on the prior felony strike (§ 1170.12), plus 25 years to life based on the firearm enhancement (§ 12022.53, subd. (d)).  Veliz contends, and the People concede, that remand is warranted to permit the trial court to exercise its discretion to strike or dismiss the firearm enhancement imposed on the attempted murder count.  We agree.

Before January 1, 2018, the sentencing court was not permitted to strike or dismiss a mandatory firearm enhancement imposed under sections 12022.53 or 12022.5.  (See §§ 12022.53, former subd. (h), 12022.5, former subd. (c).)  Effective January 1, 2018, the Legislature amended both sections to permit the superior court in its discretion to strike or dismiss a firearm enhancement in furtherance of justice.  (See Sen. Bill No. 620 (2017-2018 Reg. Sess.) Stats. 2017, ch. 682; see also *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1080.)  Because Veliz's judgment of conviction is not yet final, the amendment to section 12022.53 applies retroactively to his sentence.  (*People v. Zamora* (2019) 35 Cal.App.5th 200, 207-208; *People v. Johnson* (2019) 32 Cal.App.5th 26, 68; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1091.)

We therefore remand to allow the trial court to consider whether to exercise its discretion to strike or dismiss the firearm enhancement pursuant to section 12022.53, subdivision (h).

G. *Cumulative Error*

Veliz argues the cumulative effect of the claimed errors deprived him of due process of law and a fair trial.  "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant.  [Citations.]  Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.'" (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)

Because we have rejected all of Veliz's claims of error, there is nothing to cumulate.  Veliz received a fair trial and has failed to show any error requiring reversal of his convictions.

74

## DISPOSITION

Veliz's convictions are affirmed.  The matter is remanded to the trial court to exercise its discretion whether to strike or dismiss the firearm enhancement pursuant to section 12022.53, subdivision (h).


DILLON, J.*


We concur:


PERLUSS, P. J.


FEUER, J.

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.